AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

**LODGED**
CLERK, U.S. DISTRICT COURT

09/24/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DM _____ DEPUTY

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>OLIVIA ELIZABETH DELEON HERNANDEZ,<br><br>Defendant. | Case No. 2:20-mj-04582 |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 23, 2020 in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(A) | Possession with Intent to Distribute Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Angelica Childs*
*Complainant's signature*

_____
Angelica Childs, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____September 24, 2020_____

_____
*Judge's signature*

City and state:  _____Los Angeles, California_____

_____
Hon. Patricia Donahue, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Angelica Childs, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against OLIVIA ELIZABETH DELEON HERNANDEZ for a violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) (Possession with Intent to Distribute Controlled Substances).

2.    This affidavit is also made in support of an application for a warrant to search one digital device seized by the Drug Enforcement Agency ("DEA") on September 23, 2020, as described more fully in Attachment A: a cracked Gold and Black iPhone XS Max (the "SUBJECT DEVICE").

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (Possession with Intent to Distribute Controlled Substances) and 21 U.S.C. § 846 (Conspiracy and Attempt to Distribute Controlled Substances) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless

specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. INTRODUCTION

5.    I am a Special Agent with the Drug Enforcement
Administration ("DEA"), and have been so employed since August
2019.  I completed a 16-week DEA training program in Quantico,
Virginia, which included specialized training in the
investigation of major narcotics trafficking organizations,
violent crimes, racketeering, conspiracy, and narcotics
importation and distribution.  I have also participated in the
debriefing of defendants and informants who had personal
knowledge regarding major narcotics trafficking organizations.
Additionally, I have participated in many aspects of drug
investigations, such as extensive hours of conducting
surveillance.  I am familiar with narcotics traffickers' methods
of operation, including the manufacture, storage,
transportation, and distribution of narcotics, the collection of
money that represents the proceeds of narcotics trafficking, and
money laundering.  I am also familiar with the sophisticated
methods that drug organizations use to avoid detection by law
enforcement, such as the use of multiple cellphones, pre-paid
calling cards, counter-surveillance measures, established
relationships with legitimate businesses to hide drugs and
launder drug proceeds, vehicles with concealed compartments,
false or fictitious identities, and coded and/or vague

communications and conversations over cellphones, including text messages.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

6.    In a series of recorded calls and text messages from July 21 through September 22, 2020, individuals who identified themselves as "Cheque," "Negro," "Ivan," and "Pelon" arranged to sell a Confidential Source working with the DEA (the "CS")[1] at least 30 pounds of methamphetamine on September 23, 2020.

7.    On September 23, 2020, a total of three individuals driving in two separate cars, with one car driven by OLIVIA ELIZABETH DELEON HERNANDEZ ("HERNANDEZ"), met the CS in a parking lot in Southgate, California to exchange the drugs. Before the deal could be completed, the individuals abruptly decided to leave the parking lot without providing the methamphetamine to the CS.

8.    Local police followed HERNANDEZ's car and initiated a traffic stop after she committed a traffic violation.  During the ensuing traffic stop, HERNANDEZ consented to the search of her car.  Officers then found approximately 33 pounds of methamphetamine in the car and arrested HERNANDEZ and seized the SUBJECT DEVICE.

---

[1] The CS began working with the DEA after being identified as part of an unrelated investigation in 2014.  The CS has been working with the DEA since and receives compensation for his/her cooperation.  The CS has no known arrests or criminal convictions.  The CS has previously provided information to the DEA that has been corroborated and proven to be reliable.  The CS has conducted controlled purchases of drugs from individuals unrelated to this investigation.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my own investigation and observations in this case, my review of law enforcement reports and field notes, and my discussions with other law enforcement officers, I know the following:

**A.    Cheque Offers to Sell Methamphetamine to the CS**

10.   On or about July 17, 2020, the CS asked a contact in Mexico, an individual known to him as "Charlie," to make an introduction to someone from whom the CS could buy drugs. Charlie agreed to make the introduction.  The CS believes that Charlie then provided the CS's contact information to an individual known as "Cheque."

11.   On July 21, 2020, Cheque called the CS from a Mexican telephone number.  During that call, which was in Spanish and recorded by law enforcement, Cheque agreed to help facilitate a future sale of 80 pounds of methamphetamine to the CS at a price of $2,950 per pound.

12.   To facilitate the sale, Cheque provided the CS with a potential source of methamphetamine.  The CS contacted this source in an attempt to purchase methamphetamine.  The source, who in communications referred to himself as "Pelon," was ultimately unable to fulfill such a large order of methamphetamine.  But Pelon provided the CS with the telephone number of another methamphetamine broker (the "Unknown Broker"), who agreed to help arrange the sale of 30 pounds of methamphetamine to the CS.

4

**B.   The Unknown Broker and Pelon Arrange the Sale of Methamphetamine to the CS**

13.   Between September 11 and September 22, 2020, in a series of recorded calls and text messages, the CS communicated further with the Unknown Broker and Pelon to arrange the sale of methamphetamine.

14.   Specifically**,** on September 11, 2020, the CS received a phone call from the Unknown Broker from a Mexican telephone number.  The call was in Spanish and recorded by law enforcement.  At the direction of law enforcement, CS negotiated the purchase of 30 pounds of methamphetamine for $2,850 per pound.  The Unknown Broker indicated that he lived in Arizona but would help facilitate the sale of methamphetamine to the CS in the Los Angeles area.

15.   Three days later, on September 14, 2020, the CS received a phone call in Spanish from an unknown individual using a Mexican telephone number.  This call was in Spanish and recorded by law enforcement.  During the call, the CS informed the unknown individual that the CS would be ready to purchase the methamphetamine on September 23, 2020.  The unknown individual told the CS that he would send a contact number of a courier so the CS could further arrange the purchase of methamphetamine.

16.   On September 22, 2020, the CS received a text message from Pelon, who was using a Mexican telephone number.  Pelon informed the CS that the CS's order was ready.  Pelon then provided the CS with a different Mexican telephone number, which

Pelon indicated belonged to the courier who would be transporting the methamphetamine, an individual known as "Ivan."

17.   Later on that day, on September 22, 2020, the CS placed a recorded call to Ivan at the phone number provided. The CS asked when Ivan would have the "hielito" for the deal. Ivan then told the CS that 30 "naranjas" were ready.[2]   Ivan then told the CS to expect a phone call from the courier shortly to arrange a time and place for the narcotics transaction on the following day.

18.   At approximately 9:10 p.m. on September 22, 2020, the CS received a phone call from an unidentified male.   The call was recorded and in Spanish.   The male stated that he would meet the CS in the morning of September 23, 2020 at a location in Southgate, California.   The call ended shortly thereafter.

**C.   HERNANDEZ Meets the CS to Complete the Sale of Methamphetamine**

19.   On September 23, 2020, at approximately 11:15 a.m., law enforcement on surveillance observed two cars arrive at the location of the planned drug deal, the parking lot of a Target store in Southgate, California.   Two unidentified men were seen in the first car, a silver Toyota Camry.   A woman, later identified as HERNANDEZ, was seen driving the second car, a blue Toyota Camry, bearing California license plate 5YKN158.[3]

---

[2] Based on my training and experience, I am aware that drug dealers use coded language to discuss drugs.   Here, the word "hielito" means "ice" and the word "naranjas" means "oranges." I believe both of these terms are referring to methamphetamine.

[3] Both cars arrived at the location in a tandem.   Based on my training and experience, drug dealers sometimes travel to

20.   DEA agents observed these two cars park next to the CS's car.  One man then exited the car and walked over to CS, and began talking to him.  The man asked the CS to come to a residence to retrieve the methamphetamine.  The CS, however, asked for verification of the drugs before proceeding further. The second man then approached the CS and attempted to persuade him to go to the residence.  After the CS again requested to see the drugs before proceeding any further, the two men abruptly returned to their cars and sped off, followed by HERNANDEZ in her car.

21.   At approximately 11:23 a.m., as the two cars were departing the scene, the CS informed DEA agents that the CS believed that the methamphetamine was in the blue Camry driven by HERNANDEZ.  DEA agents then broadcasted a description of the cars and requested that Southgate Police perform a traffic stop.

22.   At approximately 11:24 a.m., after observing the blue Camry commit a traffic violation, Southgate Police officers initiated a traffic stop of the car.  During the traffic stop, HERNANDEZ consented to the search of the car, telling officers they could search the car and that if they found anything illegal, it was not hers.  Officers searched the car and found a black duffle bag in the backseat of containing approximately 33 pounds suspected methamphetamine.

---

deals in multiple cars, with the second car, also known as the "follow car," usually carrying the narcotics.

23.   Southgate Police Officers then arrested HERNANDEZ and seized the suspected methamphetamine from her car.  Officers also seized the SUBJECT DEVICE from HERNANDEZ during her arrest.

### D.   HERNANDEZ Admits to Transporting Methamphetamine

24.   In a <u>Mirandized</u> interview later that day, HERNANDEZ told DEA agents that she received the black duffle bag from her boyfriend and his friend, and that she knew that narcotics were likely inside the black duffle bag.  HERNANDEZ told DEA agents that the her boyfriend had given her the duffel bag and told her to drive to the Target parking lot in Southgate, California, and she agreed.

### E.   The Methamphetamine Tests Positive

25.   On September 24, 2020, DEA agents weighed and tested the suspected methamphetamine.  Preliminary testing confirmed the substance was methamphetamine and weighed approximately 33 pounds.

## V.  ADDITIONAL TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES

26.   Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their

illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

9

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI.   **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

27.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

28.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

11

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.  Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

30.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the

13

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

   c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERNANDEZ's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HERNANDEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  31.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

32.   For all the reasons described above, there is probable cause to believe that HERNANDEZ violated 21 U.S.C. § 841(a)(1), (b)(1)(A) (Possession with Intent to Distribute Controlled Substances).   Further, there is also probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the SUBJECT DEVICE, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 24th day of
September, 2020.


HONORABLE PATRICIA DONAHUE
UNITED STATES MAGISTRATE JUDGE